BLACK, Judge.
*49 Andrew Hyre challenges his conviction and sentence for unlawful sexual activity. He was sentenced to the statutory maximum of fifteen years in prison.[1] Hyre asserts that the trial court erred in ruling that the child hearsay statements of the alleged victim were admissible at trial. Because the trial court failed to conduct the required factual analysis and the resultant error in admitting the hearsay statements was not harmless, we reverse Hyre's judgment and sentence and remand for further proceedings.
Hyre was charged with one count of unlawful sexual activity. See § 794.05(1), Fla. Stat. (2014). The information alleged that Hyre engaged in sexual activity with A.M., the alleged victim, "a person of 16 or 17 years of age, by the sexual organ of [Hyre] penetrating the vagina" of A.M. The State filed its notice of intent to introduce child hearsay statements, identifying the hearsay statements as A.M.'s statements to her mother and her recorded interview with a detective. See § 90.803(23), Fla. Stat. (2015).[2]
An evidentiary hearing was held, following which the court entered an order finding that the hearsay statements would be admissible at trial. Hyre argues that the trial court order fails to address crucial evidence and that the findings are conclusory, merely parroting the State's child hearsay notice; he also contends that the trial court abused its discretion in determining that the sources of information were trustworthy and that the content of the hearsay statements demonstrated indicia of reliability.
I. The hearsay statements
A. A.M.'s statements to her mother
A.M.'s mother testified at the hearing. She explained that on the date of the alleged crime she, her two children, and her ex-husband were visiting extended family while on vacation in Florida. At least nine people were in the house that day. A.M.'s mother testified that A.M. went upstairs to lie down with her grandmother. A few hours later A.M. came downstairs and told her mother that she wanted to leave. The mother testified that she believed her daughter was bored and told her that they would not be leaving yet. Approximately thirty to forty-five minutes later, A.M. again told her mother that she wanted to leave and the mother again told her that they would not be leaving yet. The third time A.M. came to her mother, A.M. said she needed to talk with her mother. The two went outside, and according to the mother, A.M. told her that "[Hyre], he touched me-touched me on my vagina and my breasts." When the mother asked A.M. what she meant, A.M. responded, "I don't think I'm a virgin anymore." At that point, the mother asked A.M.'s father to come outside and A.M. "talked to her dad." A.M. was then taken to the hospital. The mother testified that prior to this she had a good relationship with Hyre, as did Hyre and A.M.'s father.
On cross-examination, the mother testified that she did not remember what she told police officers that A.M. had said. She could not recall whether she used the word "penetration" in telling the police what had occurred, and her statement was otherwise *50 different than the statement provided in the State's notice of intent to offer child hearsay evidence. A.M.'s mother also testified regarding her relationship with her ex-husband and family, reiterating that there was "no bad blood" despite the divorce.
Jane Smith, who had been at the home the night the alleged unlawful sexual activity occurred, testified as a defense witness.[3] Ms. Smith stated that she asked A.M.'s father not to bring his ex-wife, A.M.'s mother, to the house. She testified that A.M.'s mother asked where the nearest hospital was almost immediately upon arrival at the house. A.M.'s mother told Ms. Smith that she always wants to know where the nearest hospital is when she is in a new place. Ms. Smith also testified that A.M.'s mother was "ranting and talking" about how her divorce was A.M.'s father's fault and that the mother was angry and upset. She said that A.M. was present during the time A.M.'s mother was talking about her relationship with A.M.'s father. Ms. Smith further testified that A.M's mother was angry with Hyre and verbally "attacked him during that session."
On cross-examination, Ms. Smith was asked additional questions about why A.M.'s mother asked about the nearest hospital. She also was asked about A.M. "whispering" to her mother and the two leaving the house. Ms. Smith testified that A.M. and her mother "stayed out there for maybe an hour or hour and a half." She then testified that A.M.'s mother told her that Hyre had touched A.M.'s vagina. There was no indication that anyone confronted Hyre.
B. A.M.'s recorded statement
The officer who interviewed A.M. and took her statement also testified at the hearing. He stated that at the time in question he had been a detective with the special victims unit. At the time of his testimony, he was a sergeant. The sergeant testified that prior to the interview with A.M. he had not conducted a forensic interview. The sergeant spoke with A.M. after she had been examined by medical staff, and he recorded their conversation. He testified that he established that A.M. knew the difference between a lie and the truth and that he tried to avoid leading questions. He then authenticated the audio recording of the interview; it was introduced into evidence and played in court.
In the interview, A.M. stated that she had gone upstairs to lie down in a bedroom with her grandmother and that her grandmother and her sibling were in the bedroom. Hyre came into the room a few times while the others were there; everyone in the room was awake. A.M. stated that at some point she fell asleep. She remembered waking and feeling someone rubbing her back; she assumed it was her grandmother. She also heard people talking downstairs.
A.M. stated that the second time she awoke someone was touching her breasts. She saw that Hyre was lying down beside her and that "it looked like he was asleep." When the sergeant asked A.M. whether Hyre had his eyes closed, she responded: "Oh, he had his-his back was turned. His back was to me and his arm was around me." The sergeant then asked, "So he was-was he laying like on his stomach?" A.M. responded, "On his side." The sergeant confirmed that Hyre's arm was around A.M. and then said: "Okay. Now, *51 are you-I'm trying to picture this." A.M. immediately responded, "Maybe he was on his stomach."
A.M. then stated that she went back to sleep. Thereafter, she was awoken by her grandmother, who had been in the en suite bathroom taking a shower. A.M. stated, "I remember she pulled up the sheets and she, I think-I forget what she said, but he left the room." The sergeant then asked whether "he" referred to Hyre, and A.M. confirmed that it did. She then said, "And I think my [sibling] left before that." A.M. confirmed that Hyre was not in the room when her grandmother pulled up the sheets. She stated that her grandmother lay down next to her; when she next awoke her grandmother was not there. A.M. texted a male friend and then went back to sleep.[4] At this point in the interview, A.M. stated that "he was there, [Hyre]," and the sergeant asked, "The second time you fell back to sleep after texting[,] he was in the room-at that point?" A.M. confirmed that Hyre was in the room. The sergeant then asked if anyone was in the room with her when she was texting her friend, B.A.M. stated that she had been by herself. The sergeant again asked whether Hyre was there when A.M. woke up again. A.M. responded: "Wait. Yeah, [Hyre]-yeah, he was there. And I was playing a game on my phone. ... I was playing when he comes in the room."
A.M. said that Hyre was rubbing "like kind of like here," and the sergeant clarified, "I see you're pointing at your like stomach area?" A.M. then described how Hyre began fondling her. She stated that Hyre unbuttoned her top shirt then "kind of like pulled [her shirt] to the side." The sergeant then asked, "Did he push your bra aside, too?" A.M. responded, "Yeah." When asked if Hyre said anything to her, A.M. responded: "Yeah. He said things. ... Like, I remember what he said but it was like something you would say to a child. Well, I am a child, but-I can't remember it."
A.M. then described that Hyre "went lower" into her pants. The sergeant clarified: "And when you mean lower, is it towards your private area in the front? Do you know what the word is for that?" A.M. responded: "Front? Uh, I don't like that word. Vagina." A.M. then described Hyre's penetration of her vagina with his finger. She was again asked if Hyre said anything to her and whether she responded. She said she did not respond to his question of whether "it felt good." When asked to continue, A.M. stated that Hyre "pulled out his like private." The sergeant asked A.M. if she knew what Hyre's private is called, and she responded, "Penis." When asked what Hyre's penis felt like, A.M. responded that it felt "mushy."
A.M. went on to describe sexual intercourse; she stated that while she was on her back Hyre put his "private" into her "private" and started moving. A.M. described changing positions and then stated, "And then I-then it like hit me, like I remembered in school about these things." The sergeant asked, "You had health class before or something?" A.M. affirmatively responded, and the sergeant clarified the positions A.M. had described. He then asked A.M. what happened next. A.M. responded, "I remember I said that I told him he couldn't, you know, inside ejaculate." She stated that Hyre got a tissue, "ejaculated on that[,] and flushed it away."
The sergeant asked what then happened, and A.M. stated that Hyre went *52 downstairs but that she stayed upstairs. A.M. said she did not know how long it was before she left the room. She called her friend B "like eight or ten times. Because it was a bad connection-so it kept hanging up." She eventually left the room because B told her that she had to tell her mom. A.M. told the sergeant that she called B because she "felt secure by him." She stated that she eventually left the room and went downstairs when B told her that she had to tell her mother. A.M. asked her mother if they could leave; she stated that she asked her mother in way that "it didn't sound like a big deal." Her mother "brushed [her] off." A.M. stated that she kept going downstairs and then eventually told her mother that she had something to tell her. She told her mother what had happened, then talked to her father, and finally she told another family member what had occurred.
At that point in the interview, A.M. requested a break. When the interview resumed, the sergeant asked a few follow-up questions. He specifically confirmed that B told A.M. to tell her mother what had occurred. He asked whether Hyre "was around" when A.M. spoke with her mother. A.M. responded that he was; upon prompting, A.M. also stated that Hyre kept his distance after seeing A.M. speak with her mother and father. The sergeant also asked if what occurred had been recorded on a cell phone or if pictures had been taken. A.M. responded that no pictures had been taken, that she was "the only one who had the cell phone," and that she "kind off-hid [hers] afterwards." The sergeant asked if everything A.M. had told him was "true and accurate, to the best of your knowledge," and A.M. responded, "To the best of my knowledge."
During the course of the interview, A.M. was asked questions unrelated or peripheral to the alleged offense which are relevant to the admissibility of the hearsay statement. A.M. was asked to provide her home address and phone number. She was unable to provide her zip code to the sergeant and could provide only her father's phone number. She was also unable to provide the names of the extended family she was visiting. At multiple points in the interview, A.M.'s responses to questions were nonverbal; for instance, she did not audibly respond to the question "Do you promise to only talk about true things with me?" A.M. defined the truth by giving an example of breaking a vase and "covering it up." When asked if she was sleeping on a comforter or bed sheets when she was in the bedroom, A.M. responded, "It was like comforters, because I remember the pattern." When then asked to describe the pattern, she said, "I don't remember what they look like, but I know the sheets were a dark color." A.M. also stated that she "remember[ed] what [Hyre] said but it was like something you would say to a child." The sergeant asked what Hyre had said, and A.M. responded, "I can't remember it." When asked what Hyre was wearing, A.M. stated: "I think the shirt was red. Either it was red or white."[5]
After the interview was played, Hyre's counsel cross-examined the sergeant. He confirmed that the interview occurred in the early morning hours after A.M. had been at the hospital with her mother. The court then inquired about A.M.'s maturity level. The sergeant confirmed that A.M.'s *53 maturity level was "age-appropriate" but that she was "very like reclusive and very shy."
C. The order
The trial court took the issue under advisement and, approximately one month after the hearing, rendered its order. The order provides that A.M.'s mother and the sergeant testified at the hearing and contains incomplete recitations of the two hearsay statements along with limited findings of fact. There is no mention of Jane Smith or her testimony. The court reached eight conclusions, which are, in large part, verbatim recitations from the State's notice of intent. The court found, in part, that A.M. "displayed the mental, physical, and emotional capacity of a typical 16 year old,"[6] that A.M. "used terminology and descriptions that were usual or expected for a child of her age," and that "[t]here was no testimony related to motives the child may have to fabricate allegations" and "no testimony of any inappropriate influence on the child by persons involved in a domestic dispute." The court concluded that based upon the totality of the circumstances, "the time, content, and circumstances of the statements" by A.M. to her mother and the sergeant "provide sufficient indicia of both trustworthiness and reliability."
II. Analysis
A. Lack of factual analysis
Out-of-court statements made by a child sixteen years old or younger and describing an unlawful sexual act committed against the child are admissible where the child testifies at trial "[u]nless the source[s] of information or the method or circumstances by which the statement[s] [are] reported indicate[ ] a lack of trustworthiness" and where the court finds "that the time, content, and circumstances of the statement[s] provide sufficient safeguards of reliability." § 90.803(23) ; see also State v. Townsend, 635 So.2d 949, 954 (Fla. 1994). "[T]he focus is on the person to whom the statement was made and the manner in which the statement was made." N.W. v. M.W., 41 So.3d 383, 384 (Fla. 2d DCA 2010).
In evaluating the reliability of the statements, "the court may consider the mental and physical age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, the reliability of the assertion[s], the reliability of the child victim, and any other factor deemed appropriate." T.B. v. R.B., 186 So.3d 544, 551 (Fla. 2d DCA 2015) (quoting § 90.803(23)(a)(1) ).
Other factors may include, but are not limited to, a consideration of the statement's spontaneity; whether the statement was made at the first available opportunity following the alleged incident; whether the statement was elicited in response to questions from adults; the mental state of the child when the abuse was reported; whether the statement consisted of a child-like description of the act; whether the child used terminology unexpected of a child of similar age; the motive or lack thereof to fabricate the statement; the ability of the child to distinguish between reality and fantasy; the vagueness of the accusations; the possibility of any improper influence on the child by participants involved in a domestic dispute; and contradictions in the accusation.
*54 Townsend, 635 So.2d at 957-58. "[A] court is to use a totality of the circumstances evaluation in determining reliability." Platt v. State, 201 So.3d 775, 778 (Fla. 4th DCA 2016) (alteration in original) (quoting Townsend, 635 So.2d at 958 ). "[A]dmission of a child victim's hearsay statements under this exception [should] not be allowed absent clear indications of reliability." Townsend, 635 So.2d at 954.
In ruling on the admissibility of the hearsay statements, the court must place specific findings of fact on the record as to each statement. § 90.803(23)(c) ; see N.W., 41 So.3d at 384 (holding that the failure to address the "individual statements and the circumstances under which they were made" was error). "[L]ist[ing] each statement to be considered and summarily conclud[ing], without explanation or factual analysis, that the circumstances surrounding most of the statements showed them to be trustworthy" is insufficient and constitutes reversible error. Townsend, 635 So.2d at 952, 957 ; see also Hopkins v. State, 632 So.2d 1372, 1377 (Fla. 1994) (concluding that mere recitation of the statute "ignores the clear directive of the statute"). "[L]imited, summary findings [are] insufficient to satisfy the case-specific requirements of the statute because they fail[ ] to address why the time, content, and circumstance of each individual statement provide[s] sufficient safeguards of reliability." Garcia v. State, 659 So.2d 388, 392 (Fla. 2d DCA 1995).
The court's failure to conduct a factual analysis as to the reliability of each statement is "particularly troublesome" where, as here, it does not appear that the court considered internal inconsistencies within the alleged victim's recorded statement including: A.M.'s unexplained use of a clinical term where the majority of her statement described the acts in imprecise or vague terms, her inability to provide basic information to the sergeant, her ability to recall only certain, very specific details, and her deviation from prior answers upon further-often leading-questioning by the sergeant; conflicts between the two hearsay statements which reflect on various criteria; and the testimony of a witness which called into doubt the reliability of a statement's source. See Garcia, 659 So.2d at 392 ; cf. Small v. State, 179 So.3d 421, 424 (Fla. 1st DCA 2015) (affirming conviction where trial court "consider[ed] the language and gestures of the child and relat[ed] them to factors suggested by statute and case law" and the order contained thorough explanation as to child's mental and physical age, including that the child "had a very detailed memory, not only about the events [at issue] but other things as well"); Ingrassia v. State, 747 So.2d 445, 447 (Fla. 4th DCA 1999) (affirming conviction where "the trial court did not abuse its discretion in admitting the child victim's hearsay statement because '[t]he record reflects that the court cumulatively weighed numerous potential facts, such as time, circumstances, credibility, demeanor, spontaneity, internal consistency of the individual statements, and maturity of the child' " (quoting Reynolds v. State, 660 So.2d 778, 780 (Fla. 4th DCA 1995) )). Perhaps more troubling is the court's apparent failure to address that the person to whom the incident was allegedly first reported was A.M.'s friend, B, and that it was only upon his advice that A.M. talked to her mother. There is no timeframe given between when the alleged sexual activity occurred and when A.M., after repeatedly speaking with B, reported it to her mother. See Platt, 201 So.3d at 778 ("Had the court reviewed the totality of the circumstances, it might have found that the statement was not reliable or that there were discrepancies.").
*55 B. Harmless error
The court's failure to address why the time, content, and circumstances of each statement provides sufficient safeguards of reliability is not harmless error in this case. Although A.M. testified at the trial, "this does not automatically render the error harmless." Platt, 201 So.3d at 778. A.M.'s testimony was significantly abbreviated and, in some respects, inconsistent with her recorded interview. The hearsay statements were not merely cumulative of other evidence. Cf. Heuss v. State, 660 So.2d 1052, 1057 (Fla. 4th DCA 1995). No Williams [7] rule evidence was presented, cf. Diaz v. State, 618 So.2d 346, 349 (Fla. 2d DCA 1993), and Hyre testified in his defense. Although physical evidence was presented, it was not unassailable: vaginal swabs resulted in no foreign DNA evidence; the DNA evidence obtained from the victim's underwear was a partial mixture which included an unidentified third contributor; and testimony established that the lab analyst "assumed" that A.M.'s DNA was present in the mixture. The analyst also testified that she "expect[s] relatives to share some" DNA in common. Only family members were present on the night of the alleged incident.[8]
On these facts, we cannot conclude the court's error in admitting the hearsay statements in the absence of the required reliability findings was harmless beyond a reasonable doubt. See Garcia, 659 So.2d at 393 ; Platt, 201 So.3d at 778 ; cf. Seifert v. State, 616 So.2d 1044, 1046 (Fla. 2d DCA 1993) (finding error in admitting hearsay statements harmless where "[t]he medical testimony was unequivocal" and Williams rule evidence was properly introduced), approved in part, disapproved in part, 636 So.2d 716 (Fla. 1994) ; Lawson v. State, 884 So.2d 540, 547 (Fla. 4th DCA 2004) (concluding that improper admission of pretrial identification was harmless "given the very strong DNA evidence connecting" the defendant to the crimes).
III. Conclusion
The trial court's order is insufficient. The court did not conduct the necessary factual analysis considering the totality of the circumstances, nor did it consider all of the testimony presented at the hearing. The trial court improperly admitted the sixteen-year-old victim's hearsay statements under section 90.803(23), and the error was not harmless. Consequently, we reverse Hyre's judgment and sentence and remand for further proceedings.
Reversed and remanded.
NORTHCUTT and SALARIO, JJ., Concur.

Hyre's scoresheet reflects that his lowest permissible sentence was sixty-six months in prison.

We have found no cases applying section 90.803(23) where the charge is unlawful sexual activity pursuant to section 794.05. This may be because section 90.803(23) was amended as of January 2014 to increase the age of the child from eleven to sixteen, and section 794.05 applies only to sixteen- or seventeen-year-old victims. See ch. 2013-98, § 1, Laws of Fla.

"Jane Smith" is a fictitious name. In an effort to further protect A.M., we have chosen to identify this witness through a pseudonym.

A.M. identified the male friend by his first name only. The record before us provides no further information about this friend; we do not know his age or last name. We will therefore refer to A.M.'s friend as B.

At various points throughout the interview, A.M. vacillated between precisely detailed and vague answers. When asked whether she had dinner at the house at which the alleged offense took place, she responded: "I had a little like-I didn't eat the rice. I only had a little bit of chicken." The sergeant then asked, "What happened after dinner?" and A.M. responded, "Got pistachio ice cream."

We note that the recorded interview was audio only; as a result, the court could not view A.M.'s demeanor during the interview or make independent findings based on her physical responses. Cf. Cabrera v. State, 206 So.3d 768, 773 (Fla. 1st DCA 2016).

Williams v. State, 110 So.2d 654 (Fla. 1959) (codified in section 90.404(2), Florida Statutes ).

Hyre was not the only male present in the home on the night the incident was alleged to have occurred; but he was the only one from whom a DNA sample was taken.